[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff appeals from the decision of the Board of Tax Review of the City of Hartford. On April 27, 1990 the Board affirmed the doings of the Assessors of the City of Hartford whereby the Assessors determined the full fair market value of the plaintiff's property to be $11,970,600 as of the assessment date of October 1, 1989. The parties stipulate that this appeal also pertains to the subsequent assessments of 1990, 1991, 1992 and 1993.
The subject property consists of a parcel of land with building and improvements located thereon known as #999 Asylum Avenue, Hartford, Conn. The parcel consists of a total land area of 114,127 square feet, 2.62 acres, on which is constructed a five story office building plus a penthouse office facility. The above-ground building area comprise 99,090 square feet. The net rentable above ground area, excluding common areas, is 93,158 square feet. Additionally, in the lower or below grade area is additional office space comprising 14,615 square feet. The combination thereof produces a net rentable area of 107,773 square feet.
The building was constructed in 1962. The building is of steel frame construction with exterior of brick veneer, and glass in aluminum frames. It is in generally good condition, but exhibits some functional obsolescence due to its age and design. The single pane glass exterior, which is the most prominent feature of the building is very inefficient by today's standards. The building has unacceptable asbestos in some of the tenant areas and in some of the mechanical rooms. Although this condition does not have to be remedied in its CT Page 10302 entirety immediately, it must be gradually resolved as new tenants move in. To date four suits have been so remedied, at a cost of $125,000 leaving approximately 60% to 65% of the building still requiring asbestos removal.
The property appears to be functional, with adequate on-site parking. Properties adjacent to the subject on Asylum Avenue are well maintained, and adjacent residential areas show signs of aging and deferred maintenance. St. Francis Hospital is located nearby, but does not appear to afford any significant rental support for the subject. Only one of the tenants is listed as a medical provider, M.D., and occupies a relatively small amount of space. The subject is sufficiently distant from the downtown area as to be beyond convenient walking distance. The subject does not appear to be enhanced by any reasonable convenient access to downtown shopping or to the cultural or social amenities of downtown Hartford. Access to the premises from the interstate highway system, though reasonably proximate in geographical distance, is cumbersome because of the need to use local streets for some distance after exit, or to gain access to the interstate highways.
The characteristics of the subject are best described by the neutral term "functional." The subject is best suited to meet the needs of state and city agencies social service and non-profit agencies, and other enterprises whose budgets for accommodations are modest.
The appraiser who testified on behalf of the plaintiff was of the opinion that of the accepted methods for valuation the income-capitalization method was the most valid approach. The appraiser who testified for the defendant stated that the income-capitalization method is typically recognized as the most reliable value indicator for income producing property such as the subject.
Both appraisers also gave evidence on the basis of the Market Approach, based upon the Concept of Comparable Sales. The plaintiff's appraiser used the approach as a "back-up" approach. The defendant's appraiser used the method as a primary approach. Both appraisers agree that the Reproduction Cost-Depreciation method is realistically inapplicable for this subject property.
The court carefully reviewed the "comparable" sales CT Page 10303 utilized by each of the appraisers. The court determines that the proffered "comparables" are so diverse in location, age of construction, market area, facilities and the like as to have little significance in valuing the subject property. The extent of "adjustments" required to attempt to draw meaningful comparisons are so extensive as to depart from the rational concept of comparability. Such diversity exists, both amongst the sales themselves, and the sales as related to the subject, as to compel the conclusion that "insufficient data in such town based or current bona fide sales of comparable property" is the state of reality as concerns the valuation of this subject property. See Conn. Gen. Stat. 12-63b.
As concerns the "comparables" the timing of the valuation, October 1, 1989, is significant in this case. Vacancy rates prior to 1989, at which time most of the "comparables" were sold, were at an unprecedented low of approximately 6% in the downtown area (central business district area) and 12% in the non-central business district area. By the fourth quarter of 1989 the vacancy rates had escalated to 15% in the central district and 24% in the noncentral business district. The pre-1989 sales prices were fueled by an unwarranted optimism, in retrospect, that pre-1989 vacancy rates and commensurate high demand would continue. The appraisers acknowledge that those prices had far outstripped the income producing capacity and value of the buildings. By October, 1989, reality had settled in, even as concerns syndicates whose valuations were based upon a proposition of continued extreme low vacancy and commensurate high demand. When the premise failed, as it had by October 1, 1989, then the conclusion based thereon became inappropriate. By October 1, 1989, the properties would have reverted to their intrinsic value based primarily upon income production. The prospect for extraordinary growth had disappeared for everyone, builders and syndicator included by the fourth quarter of 1989. The market value-comparable sales approach does not reflect "true and actual value" for the reasons set forth herein. Conn. Gen. Stat. 12-63b.
Both appraisers used the Income-Capitalization method. The court determines that this approach is the most appropriate means to value the subject property.
The total rental area of the building is 107,773 square feet. The realistic vacancy rate for this property is 15%. CT Page 10304 A rate of 5% used by the defendant's appraiser is not supported by the evidence. A 20% rate proffered by the plaintiff's appraiser is unduly pessimistic.
The court determines that an average blended per square foot market rental rate for the entire 107,773 square feet is $15.50 per square foot. Some of the space will yield a lesser rate, and some of the space will yield a higher rate.
Gross income for the property, with 15% vacancy rate, at $15.50 per square foot, is evaluated at $1,419,909.
The court finds that the total yearly expense applicable to the subject property is evaluated at $661,488. This includes fixed expenses of $208,002 as per the plaintiff's appraisal, and includes the variable expenses of cleaning, utilities, management fees and tenant improvement reserves. The variable expenses are greater than those testified to by the plaintiff's appraiser by virtue of a lesser vacancy rate than that proposed by the plaintiff's appraiser. Tenant improvement reserves are higher than would otherwise be expected because of the problems with asbestos and the need to improve the large amount of presently unoccupied rentable space, 1989, to suit new tenants. The total expense figure is somewhat less than art upper range highest figure of the spread set forth by the defendant's appraiser.
Gross income for the property is determined at $1,419,909. Expenses are determined at $661,488. Net income is calculated at $758,421.
To arrive at valuation the net income must be capitalized. Using the capitalization rate of the plaintiff's appraiser, .116406, which is very close to that of the defendant's appraiser, the court determines that the true and actual value of the subject property as of October 1, 1989, is $6,515,308.
The court sustains the appeal and reduces the true and actual value of said property to the amount of $6,515,308.
L. Paul Sullivan, J. CT Page 10305